UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DONNA MOORADIAN and WILLIAM MOORADIAN**, *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>**FCA US LLC**<br><br>Defendant. | Case No. 1:17-cv-01132<br><br><br>**CLASS ACTION COMPLAINT**<br>**WITH JURY DEMAND** |

Plaintiffs Donna and William Mooradian ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through the undersigned counsel, bring this Class Action Complaint against Defendant FCA US LLC (also "Fiat Chrysler" or "Chrysler"). Plaintiffs allege the following based upon personal knowledge as to their own acts, and based upon the investigation conducted by their counsel as to all other allegations:

### NATURE OF THE CASE

1. This action concerns Chrysler's refusal to honor its warranty and cover the cost of repairing a manufacturing defect in the engines of Chrysler's Jeep Wrangler model years 2012-2017 (collectively, "Jeeps" and "class vehicles").

2. During the engine-production process, Chrysler does not sufficiently purge the casting sand from the engine (the "Manufacturing Defect"). As a result of excess sand in the engine, the Jeeps' radiators and oil coolers fill with a sludge-like residue that damages and ultimately destroys these and other components (collectively, "Affected Components") of the class vehicles.

1

3. Chrysler knew or should have known about the Manufacturing Defect from pre-sale testing of the class vehicles before the sale of the first class vehicle in late 2011. Moreover, hundreds of publicly-available consumer complaints, as well as Chrysler's own customer complaint records, gave Chrysler notice of the pervasiveness of the Manufacturing Defect as early as June 2012.

4. Nonetheless, Chrysler did not disclose the Manufacturing Defect to past purchasers of class vehicles, even when customers brought their class vehicles into Chrysler dealerships for repair of the Manufacturing Defect, and Chrysler continued to sell class vehicles to consumers without disclosing the Manufacturing Defect.

5. Every class vehicle was sold or leased pursuant to express and implied warranties, including a Powertrain Limited Warranty that covers the cost of all parts and labor needed to repair a powertrain component, including the engine, that is defective in workmanship and materials within five years or 100,000 miles, whichever occurs first, calculated from the start date of the Basic Limited Warranty. The Basic Limited Warranty begins on the date a purchaser takes delivery of the vehicle or the date when the vehicle was first put into service, whichever is earlier.

6. Plaintiffs Donna and William Mooradian and other class vehicle owners and lessees similarly situated (the "Class" or "Class Members") requested that Chrysler, or through it's authorized dealers, repair the Manufacturing Defect, but Chrysler refuses to cover the costs of labor and repair. Instead, Chrysler informed Plaintiffs and the Class either that the warranty did not cover the repair because the problem was created by "external factors" or owner "misuse" or that the warranty period had elapsed.

7. Plaintiffs bring claims under breach of express warranty, breach of implied warranties, breach of the Magnusson Moss Warranty Act, and breach of the Ohio Consumer Sales Practices Act. Plaintiffs and the Class seek to recover damages they incurred as a result of Chrysler's failure to inform Plaintiffs and the Class about the Manufacturing Defect and its failure to repair or replace the engine components damaged as a result of the Manufacturing

Defect. Moreover, Plaintiffs and the Class also seek a declaration that the Manufacturing Defect should be covered under the Powertrain Warranty and an extension of the Basic Limited Warranty to cover repair of the Affected Components damaged as a result of the Manufacturing Defect. Plaintiffs also request an injunction ordering Chrysler to inform purchasers of the class vehicle of the Manufacturing Defect. Plaintiffs seek attorney's fees and costs, pre- and post-judgment interest, and all other remedies and relief permitted by law.

## THE PARTIES

8. Plaintiffs Donna and William Mooradian, proposed Class and Subclass representatives, are Ohio citizens who reside in Cuyahoga County.

9. Defendant FCA US LLC is a Delaware limited liability company with its headquarters in Auburn Hills, Metro Detroit.

## JURISDICTIONAL ALLEGATIONS

10. The United States District Court for the Northern District of Ohio has original subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class exceeds one hundred members, the aggregate amount in controversy (excluding interest and costs) exceeds $5,000,000, and there is the requisite degree of diversity of citizenship between the parties.

11. The United States District Court for the Northern District of Ohio also has original subject matter jurisdiction over the Magnuson-Moss Warranty Act claim, 15 U.S.C. § 2301, pursuant to 28 U.S.C. § 1331.

12. The United States District Court for the Northern District of Ohio can exercise supplemental jurisdiction over the Class's state law claims under 28 U.S.C. § 1367.

13. The United States District Court for the Northern District of Ohio can exercise personal jurisdiction over Chrysler because it had regular and systematic contacts with the state of Ohio, in which it does business and places the Jeeps in the stream of commerce.

14. The United States District Court for the Northern District of Ohio is a proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because Chrysler is subject to personal

jurisdiction in this District, and the sale of the Mooradian Plaintiffs' Jeep occurred in this District, and such sale gave rise to this action.

15. This Court is the proper Division for this action under Local Rule 3.8 because the sale of the Mooradian Plaintiffs' Jeep occurred in Medina County, Ohio.

## THE DEFECT

16. Many automotive manufacturers make engine component parts using a sand-casting method, which utilizes expendable sand molds to form complex metal parts from alloys. Upon information and belief, Chrysler used a sand-casting method in manufacturing component parts for the Jeep engines during the class period.

17. Class vehicles have a Pentastar V-6 3.6-liter ("Pentastar") engine. Pentastar engine blocks are made using a die-casting method rather than a sand-casting method. However, the cylinder head that is located on top of the engines are made using a sand-casting method.

18. This is not the first time Chrysler has experienced issues with its cylinder heads in the company's Pentastar engines. In 2012, Chrysler voluntarily recalled 7,500 cylinder heads due to a "ticking" sound in the engine, stalling, and other problems during use.[1]

19. Upon information and belief, during the production process, Chrysler does not sufficiently purge the sand from the cylinder head. Thus, excess sand is left in the cylinder head that seeps out gradually as the vehicle is driven.

20. All sand must be removed or destroyed during production of the cylinder head or other component engine parts will experience extensive problems. Specifically, any residual sand that remains from the sand-casting process in the engine can also improperly circulate through the vehicle's cooling system and settle in the heater core, radiator, and oil cooling systems. The sand forms a sludge-like build-up in the bottom of the radiator reservoir that continues to accumulate until heating and cooling systems malfunction and fail.

---

[1] http://autoweek.com/article/car-news/dealers-repairing-chrysler-v6-engines-some-pentastars-need-new-cylinder-heads

4

21. Plaintiffs and the Class do not learn of the existence of the Manufacturing Defect until the heating and cooling systems fail even though the sand starts to shed from the cylinder head and collect in the radiator immediately after the vehicle is driven.

22. The failure of the heating and cooling functions in class vehicles compromises the safety of class vehicles. Drivers without heat cannot defrost their vehicles, rendering them difficult or impossible to drive in cold-weather conditions and unsafe, especially when freezing precipitation occurs while driving. Drivers without air cannot drive in hot-weather conditions.

23. The Manufacturing Defect cannot be cured by normal automotive maintenance because regular engine flushes do not remove the sludge-like sand residue at the bottom of the radiator, which is too thick for such a procedure. Moreover, any relief provided by a routine engine flush is, at best, only a temporary improvement because the casting sand has already circulated within the vehicle and continues to build up in the engine once the class vehicles resumes operation.

24. Upon information and belief, engine flushes, radiator replacements, and heater core replacements, and air conditioning components will continue indefinitely until an engine without any leftover casting sand is installed in the Jeeps.

**CHRYSLER KNEW OR SHOULD HAVE KNOWN ABOUT THE DEFECT, IN PART, BECAUSE CONSUMERS HAVE EXTENSIVELY REPORTED THE DEFECT TO CHRYSLER.**

25. There were thousands of Jeeps manufactured by Chrysler using the sand-casting method since 2012. Moreover, there are numerous complaints on the Internet from absent Class members regarding the Defect:

**#18 Wrangler 3.6**
Automatic transmission    26,000 miles

I bought my 2012 Jeep Wrangler used in February 2015 with approximately 11,110 miles. By this winter (2016) I had put approximately 26,000 miles on the vehicle. When I went to turn on the heat the driver's side was blowing cold air and the passenger's side hot. I took it to my local garage and they said I had casting sand built up and suggested I replace my heater core and radiator. They encouraged me to contact Chrysler to see if they would do a "good faith" warranty replacement since this was a known problem. I called Chrysler and they said I needed to take my Jeep to a dealership for an official diagnostic test before they would make a decision. The dealership informed me that my heater core was already replaced in Jan. 2015 and likely needed to be replaced. The part was still under a Mopar warranty thankfully, but Mopar wanted the dealership to flush the heater core before they would authorize replacement of the part. Soooo, my heater core was flushed and now I have heat again. However, if this is a problem that results from casting sand build up (which the dealership mechanic said it was) won't this just happen again? In summary, at 11,000 miles the heater core was replaced. The new heater core needed to be replaced after 26,000 miles, but was flushed instead. I'm thinking of trading in the 2012 model for a newer one if this is a known problem with this year...

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016):

**#15 Wrangler Sport 3.6L**
Automatic transmission    18,000 miles

2012 Wrangler Sport. No heat on the drivers side. After doing some research I learned that this is a common problem with the Wranglers and is likely caused because casting sand had not been sufficiently flushed from the engine block when manufactured. Coolant stirs up the casting sand and it then settles in the bottom of the radiator, heater core and overflow tank. The sediment in the heater core restricts coolant flow causing poor heating of the vehicle.

I checked my overflow tank and found about 3" of sand in the bottom. The service manager at the Jeep dealership said he did not have a recall, campaign or service bulletin on this and it would not be covered by Jeep. He said he'd not heard of the issue, but when he asked fellow service managers they had heard of it in older Wranglers. This is a pretty outrageous issue if you ask me. Nobody but Jeep dealers have serviced the vehicle, so where would significant amounts of sand-like residue come from to get into the cooling system?

Any feedback or help from the community would be appreciated.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016)

**#21 Wrangler Sahara 3.6L**
Automatic transmission    46,500 miles

Bought this used 2012 Jeep Wrangler Unlimited Sahara in September, 2016 from a dealer in Cincinnati, Ohio. I test drove the vehicle on a 88 degree day so I couldn't tell if the heater was working properly or not. After getting it home to northern Michigan and turning on the heater on the first cool fall day, I immediately noticed just cool air coming from the heating system on the driver's side. After paying for a heater core flush and a thorough evaluation by the Jeep dealer it was determined that the heater core was plugged. I was informed at that time that there was no recall on the heater core and the repair was not covered by warranty. With winter on the way, I had not choice but to fix it at a cost of $1,163. It seems based on many other stories like this, Jeep obviously had a supplier problem and should step up to the plate and cover these repairs.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml   (last visited on May 25, 2016)



http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html (last visited on May 25, 2017)

> **Heater Core, No Drivers Heat and Casting Sand**
>
> I have a 2013 with 14,000 miles. The water pump was replaced in August at 9,600 miles due to the chirp.
>
> I am currently getting blast furnace heat on the passenger side, Luke warm on the drivers side. I took it to the dealer today and they called, said it was fixed and blamed it on a sticky actuator in the duct work. When I arrived to pick it up, the problem was still there.
>
> I explained the casting sand stories I have read on this forum and they said they would go ahead and replace the heater core tomorrow. They are expecting it to take two days because they have to pull the seats, console and dash. The A/C system also has to bled and then refilled.

http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html (last visited on May 25, 2017)

## CHRYSLER'S EXPRESS WARRANTIES COVER THE MANUFACTURING DEFECT

26. Chrysler provides warranties for the class vehicles' engine blocks that cover the Manufacturing Defect, including (among others), a "New Vehicle Limited Warranty" that provides "bumper to bumper coverage for 3 years or 36,000 miles"; and a "Powertrain Limited Warranty" that provides coverage for the engine block for "5 years or 100,000 miles." Under these and other warranties, Chrysler promised to repair or replace engine and other components arising from defects in materials or workmanship, including the Defect, at no cost to Class members.

27. The Powertrain Limited Warranty covers the gasoline engine and the cylinder block, also known as the engine block. The engine cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; and seals and gaskets.

28. Chryslers warranties appear in window labels on the vehicles, in the owner's manuals and brochures, and on the company's websites.

**PLAINTIFFS' EXPERIENCES**

29. In July 2013, Donna and William Mooradian leased a new 2013 Jeep Wrangler Unlimited for personal and family use from the Brunswick Auto Mart[2], an authorized dealer and agent of Chrysler, in Medina County, Ohio. Like all new Chrysler vehicles, Plaintiffs' class vehicle came with Chrysler's New Vehicle Limited Warranty and Powertrain Limited Warranty.

30. Thereafter, Plaintiffs performed normal and routine maintenance. Further, Plaintiffs were never informed in any way by Defendant that their vehicle contained the Manufacturing Defect.

31. In October 2016, due to the cold weather, Plaintiffs attempted to utilize the heat in their class vehicle. However, it only emitted cool air from the vents despite the heat being set to the warmest setting. This condition continued to occur during the entire operation of the vehicle on that occasion and others going forward.

32. In addition, the Plaintiffs attempted to utilize the defroster on the Jeep due to ice or frost on the windshield. However, the defroster only emitted cold air, which did not defrost the windshield and actually caused the windshield to fog during use, causing the Plaintiffs to fear for their safety when driving the vehicle. Plaintiffs felt that the Manufacturing Defect caused the class vehicle to be unsafe and unusable on various occasions.

33. In January 2017, at 33,000 miles and after repeatedly experiencing the same problems for several months, Plaintiffs took their class vehicle to Brunswick Auto Mart for repair. Upon inspection, they were informed that a sludge-like residue was found in the radiator and oil cooler and had caused the problems by restricting air flow through the cooling system. Upon information and belief, unknown to the Plaintiffs, the sludge-like residue had been building up in the radiator for a number of years from residual sand from the engine casting process.

---

[2] Brunswick Auto Mart advertises itself as an approved Chrysler dealership and service center.

34. Plaintiffs were informed that the radiator, oil cooler, and heater core would need to be replaced. Plaintiffs were also informed that the repair was not covered under warranty because the repairs were outside the 3 year/36,000 mile warranty.

35. Plaintiffs were quoted $2600 by Brunswick Auto Mart to replace the radiator, oil cooler, and heater core. Plaintiffs objected to paying this amount. After consulting with the Service Manager, the Plaintiffs paid $300 for the aforementioned proposed repairs. Brunswick Auto Mart at its own expense covered the different between Plaintiffs' payment and the actual cost of the aforementioned repairs. Brunswick Auto Mart never disclosed that the Manufacturing Defect damaged the radiator, oil cooler, and heater core, as explained herein. In addition, Brunswick Auto Mart did not replace nor repair the engine components which were the source of the aforementioned problems. As such, Plaintiffs fear that the component parts that were replaced are being damaged again.

## CLASS ALLEGATIONS

36. At the time of Plaintiffs' and the Class' purchases, Chrysler failed to disclose the consumer complaints, malfunctions, safety hazards, and material facts related to the class vehicles' Manufacturing Defect and the Affected Components.

37. Before Plaintiffs purchased their respective class vehicles, Plaintiffs were never informed of, or aware of, the class vehicles' Manufacturing Defect and the Affected Components.

38. Had Chrysler disclosed the defect, Plaintiffs would not have purchased the class vehicle or would have paid significantly less for it. Plaintiffs were denied information material to their purchase and willingness to use the class vehicle.

39. Due to the Defect, the value of the Jeeps at the time or purchase or lease was less than the amounts Class members paid.

40. The Defect causes the Jeeps to lose value, including trade-in and re-sale value.

41. The Defect causes Class members to face repair costs, and to lose use and enjoyment of the Jeeps, and to suffer time and burden arranging and obtaining repairs.

## PROPOSED CLASS

42.   Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3) on behalf of the following Class:

**Nationwide Class.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the United States.

43.   Plaintiffs also bring this case on behalf of the following state-wide Subclass:

**Ohio Subclass.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the State of Ohio.

## CLASS CERTIFICATION ALLEGATIONS

44.   **Numerosity.** The Class and the Ohio Subclass is comprised of thousands of Chrysler Jeep Wrangler owners throughout the United States and within Ohio, making joinder impossible.

45.   **Commonality.** Questions of law and fact exist that are common to all Class and Subclass Members, and predominate over any questions that affect only individual Class and Subclass Members, including (among others):

    a.   Whether Model Year 2012-2017 Jeep Wranglers engines suffer from a Manufacturing Defect;

    b.   Whether the Manufacturing Defect causes damage to the Affected Components;

    c.   Whether the Manufacturing Defect existed at the time of the manufacture of the class vehicles;

    d.   Whether Chrysler knew or should have known about the Manufacturing Defect

    e.   Whether Chrysler failed to disclose Manufacturing Defect at the time that Class and Subclass Members purchased the class vehicles or thereafter;

      f.      Whether Chrysler breached its express warranties by refusing to repair the Manufacturing Defect;

      g.      Whether Chrysler's failure to disclose the Manufacturing Defect constitutes an unfair and deceptive act or practice in violation of the Ohio Consumer Sales Practices Act;

      h.      Whether Chrysler acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making the award of equitable relief appropriate to the Class and Subclass as a whole;

      i.      Whether Chrysler's conduct violates state law pursuant to Magnusson Moss Warranty Act.

      j.      Whether the Manufacturing Defect impairs the value of the Jeeps;

46.    **Typicality.** Plaintiffs' claims are typical of the claims of Class and Subclass Members;

47.    **Adequate Representation.** The Plaintiffs are adequate representatives of the Classes.

48.    **Superiority.** A class action is a superior method for adjudicating the claims at issue in this case and class-wide adjudication can be efficiently managed.

49.    **Predominance.** This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

50.    Class-wide injunctive, declaratory, or equitable relief is appropriate.

## TOLLING OF STATUTE OF LIMITATIONS

51.    **Active Concealment Tolling.** Any statutes of limitations are tolled by Chrysler's knowing and active omission of the fact that the transmission suffered from a defect. Chrysler kept Plaintiffs and all Class and Subclass Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiffs. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody,

and control, to the exclusion of Plaintiffs and the Class and Subclass Members. Plaintiffs could not reasonably have discovered the fact that the transmissions suffered from a defect that would cause repeated and significant failures.

52. **Estoppel.** Chrysler was and is under a continuous duty to disclose to Plaintiffs, as well as Class and Subclass Members, the true character, quality, and nature of the transmissions. At all relevant times, and continuing to this day, Honda knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the transmissions. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. Plaintiffs and Class and Subclass Members reasonably relied upon Chrysler's knowing and/or active omissions. Based on the foregoing, Chrysler is estopped from relying upon any statutes of limitation in defense of this action.

53. **Equitable Tolling.** Chrysler took active steps to omit the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the class vehicles with the problems caused by sand-residue to external or operator factors,. The details of Honda's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Honda wrongfully omitted its deceitful acts described above. Should it be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

54. Given Chrysler's active and knowing concealment of the Defect, and the company's false and misleading statements attributing the problems caused by sand-residue to external or operator factors, equitable tolling of the statutes of limitations or repose applicable to the causes of action brought in this case is appropriate.

55. Plaintiffs and Class members could not have reasonable discovered the true reasons for the Defect until the recent investigation which led to the filing of this Complaint.

## FIRST CAUSE OF ACTION
### Breach of Express Warranties
**(On Behalf of the Nationwide Class or, in the alternative, the Ohio Subclass)**

56. Plaintiffs, on behalf of the Class or, in the alternative, the Ohio Subclass, incorporate all of the foregoing allegations into this cause of action.

57. Chrysler expressly warrantied that it would cover the cost of all parts and labor needed to repair any item on the vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation.

58. Chrysler materially breached its express warranties by manufacturing, selling, and leasing Jeeps that contained the Manufacturing Defect, which rendered the vehicles unsafe or unfit for use as warrantied.

59. Chrysler was put on notice of the breach by Plaintiffs' efforts to get the vehicle repaired at its authorized dealerships.

60. In addition, Chrysler's express warranty has failed of its essential purpose due to the Manufacturing Defect continuing to manifest despite efforts by Plaintiffs and Class members to have their Jeeps repaired, yet the Manufacturing Defect remains. Namely, the casting sand remains in the cylinder head and until replaced, will continue to damage and destroy the engine components, radiator, oil cooler, and heater core.

61. As a result of Chrysler's breach of warranties, Class members have sustained damages, including diminished value of the class vehicles.

62. Chrysler's time limits on its warranties are unconscionable because Chrysler knew or had reason to know that Plaintiffs and Class members would not experience or detect sludge like sand build-up in the early life of the Jeep and, in many instances, such manifestation of the Manufacturing Defect would only occur after the warranty period had expired. And by making false and misleading representations about the nature of the Defect, Chrysler further prevented Class members from timely exercising their rights under the warranties.

63. Plaintiff and Class members are entitled to recover all damages as a result of said breach of warranties in an amount in excess of $5,000,000.

## SECOND CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*
### (On Behalf of the Class or, in the alternative, the Ohio Subclass)

64. Plaintiffs, on behalf of the Class or, in the alternative, the Ohio Subclass, incorporate all of the foregoing allegations into this cause of action.

65. Under the Magnuson-Moss Warranty Act, Class members are "consumers," Chrysler is a "supplier" and "warrantor," and the Jeeps (and their defective engine blocks) are "consumer products."

66. Under the Act, Chrysler was obligated to disclose to Class members the known Defect within the Jeeps, and was obligated to repair or otherwise remedy the defective engine blocks and related components.

67. Chrysler failed to meet its disclosure and remedy obligations, despite reasonable opportunity to do so.

68. Chrysler's violation of the Act caused damage to Class members and entitles them to statutory relief.

## THIRD CAUSE OF ACTION
### Breach of Implied Warranties
### (On Behalf of the Nationwide Class and Each State Class)

69. Plaintiffs incorporate all of the foregoing allegations into this cause of action.

70. Chrysler warrantied that the Jeeps were of merchantable quality and fit for their ordinary purpose. Chrysler warrantied that the Jeeps' engine blocks had been properly made and would not emit casting sand over time into the radiator and other components, damaging them. Chrysler breached these implied warranties: the Jeeps were not merchantable because you could not drive them or drive them safely; and the Jeeps' engine blocks had not been properly manufactured but instead emitted casting sand over time into the radiator and other components,

damaging them, such that the Jeeps' heating and defrosting mechanisms did not work properly even during the early life of the vehicles.

71. As a result of Chrysler's breaches of implied warranties, Class members suffered damages.

### FOURTH CAUSE OF ACTION
### Negligence
### (On Behalf of the Nationwide Class and Each State Class)

72. Plaintiffs incorporate all of the foregoing allegations into this cause of action.

73. Chrysler owed Class members a duty of reasonable care to properly produce the Jeeps' engine blocks and to take all necessary steps to eliminate casting sand from the blocks.

74. Chrysler breached its duty by failing to properly produce the Jeeps' engine blocks and failing to take all necessary steps to eliminate casting sand from the blocks.

75. As a direct and proximate result of Chrysler's negligence, casting sand remained in the blocks and created the Defect, which caused damages to Class members.

### FIFTH CAUSE OF ACTION
### Violation of the Ohio Consumer Sales Practices Act, O.R.C. 1345, et seq. ("OCSPA")
### (On Behalf of the Ohio Subclass Class)

76. Plaintiffs, on behalf of the Ohio Subclass, incorporate all of the foregoing allegations into this cause of action.

77. Under the Act, Chrysler is a "supplier," Ohio Class members are "consumers," and the sale or lease or the Jeeps is a "consumer transaction."

78. Chrysler violated the OCSPA by representing that the class vehicles, their engine blocks, and related components had characteristics, uses, or benefits which they did not have, or that the class vehicles, their engine blocks, and related components were of a particular standard, quality, or grade which they were not.

79. As a result of Chrysler's statutory violations, Ohio Class members sustained injuries and are entitled to relief under the Act.

## PRAYER FOR RELIEF

Therefore, Plaintiffs seek judgment against Chrysler and relief as follows:

1. An Order certifying this case as a Class Action;

2. An Order appointing the Plaintiffs as the Class Representatives of the National Class and of the Ohio Subclass;

3. An Order appointing Plaintiffs' counsel as Class Counsel;

4. Damages and other relief under statutory or common law;

5. Attorney's fees and costs;

6. Pre- and post-judgment interest;

7. Declaratory, injunctive, and equitable relief; and

8. Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the proposed Class and Subclass, hereby demand a trial by jury as to all matters so triable.

Respectfully submitted,

s/ Jack Landskroner
Jack Landskroner (0059227)
Drew Legando (0084209)
**LANDSKRONER GRIECO MERRIMAN LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
Tel: (216) 522-9000
Fax: (216) 522-9007
jack@lgmlegal.com, drew@lgmlegal.com

*Pro hac vice pending*
Daniel K. Bryson
John Hunter Bryson
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com
hunter@wbmllp.com

17

        Gregory F. Coleman
        **GREG COLEMAN LAW PC**
        First Tennessee Plaza
        800 S. Gay Street, Suite 1100
        Knoxville, TN 37929
        Tel: 865-247-0080
        Fax: 865-522-0049
        greg@gregcolemanlaw.com

*Attorneys for Plaintiffs*